IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| **STATE OF ALABAMA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV 2005-219** |
| | ) | |
| **ABBOTT LABORATORIES, INC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BAYER CORPORATION, BAYER PHARMACEUTICALS CORPORATION, AND BAYER HEALTHCARE, LLC'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

Bayer Corporation ("Bayer Corp."), Bayer Pharmaceuticals Corporation ("Bayer Pharmaceuticals"), and Bayer Healthcare, LLC ("Bayer Healthcare") join in the Defendants' joint memorandum in support of their motion to dismiss. The Bayer Defendants submit this supplemental memorandum to address issues unique to them.

In 2001, Bayer Corp. entered into a settlement with the State of Alabama (the "State") ("Settlement Agreement") that expressly releases Bayer Corp. and its affiliates from the claims in the First Amended Complaint. *See* 2001 Settlement Agreement, Ex. A. This Settlement Agreement was preceded by an investigation that focused on Bayer Corp.'s reporting of AWPs for six of its products – Koate®, Kogenate®, Konyne®-80, Gamimune® N 5%, Gamimune® N 10%, and Thrombate® III. *See* Ex. A, Part II(C). The Settlement Agreement summarized the State's allegations as to these drugs (identified as the "Qui Tam Drugs") as follows:

> Bayer … knowingly and intentionally engaged in a marketing scheme whereby it set the Average Wholesale Prices ("AWPs") of the Qui Tam Drugs at levels far higher than what the vast majority of its customers actually paid for these products when purchasing either directly from

> Bayer or through a wholesaler. Because the [State] use[s] AWP as a benchmark in determining reimbursement rates, the State contends that as a result of Bayer's actions, Bayer's customers received reimbursement from [the State] Medicaid program[] at [a] level far higher than [its] actual costs.

Ex. A, Part II(C)(i). Significantly, the State decided at that time *not* to pursue any claims against Bayer Corp. with respect to any drugs other than the Qui Tam Drugs.

In consideration of Bayer Corp.'s payments under the AWP Settlement Agreement, the State agreed to a broad release. Specifically, the State released Bayer Corp. and its "subsidiaries and affiliates" from:

> *any* civil or administrative monetary claim, action, suit or proceeding the State has or may have relating to claims submitted to the State Medicaid Program for the Covered Conduct.

Ex. A, Part III(2 & 3) (emphasis added). In addition, the release "fully discharges Bayer from any obligation to pay restitution, damages, and or any fine or penalty to the State for the Covered Conduct." *Id.* [1]

The AWP Settlement Agreement also requires Bayer Corp. to comply with detailed reporting obligations with respect to pharmaceutical prices. Under Part III(8), Bayer Corp. agreed to report the "average sales price" ("ASP") for *every* drug that it sells in the United States – not just the six covered by the release – to Alabama for a period of five years. Ex. A, Part III(8). The rationale behind the reporting obligation was to provide Alabama and the other settling states with additional pricing information to consider in making reimbursement decisions. *Id.* In accordance with the AWP Settlement Agreement, Bayer Corp. has faithfully reported ASPs to Alabama and other settling states on a quarterly basis for the last four years.

[1] As noted, the Settlement Agreement releases "Bayer, its parent corporation(s), subsidiaries and affiliates." Ex. A, Part III(3). The Agreement thus covers Defendants Bayer Pharmaceuticals and Bayer Healthcare to the same extent as Bayer Corp. *See* Am. Cmplt. ¶¶ 30-33 (identifying Bayer Pharmaceuticals and Bayer Healthcare as affiliates of Bayer Corp.)

The Settlement Agreement thus bars the State from suing Bayer Corp., Bayer Pharmaceuticals, and Bayer Healthcare for alleged AWP inflation relating to the covered drugs.[2] *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 321 F. Supp. 2d 187, 208 (D. Mass. 2004) (dismissing claims against Bayer based on a similar settlement between Bayer and the State of Montana); *see also State of Nevada v. Abbott Laboratories*, No. CV02-00260 (Washoe County Ct. Dec. 13, 2004) (dismissing claims against Bayer based on a similar settlement between Bayer and the State of Nevada) (Ex. B). The conduct at issue in the 2001 Settlement Agreement and the conduct for which the State now seeks to recover are identical. Each of the four Counts of the Amended Complaint are based on the alleged false price reporting of AWPs for drugs. (Am. Cmplt. ¶¶ 136, 140, 144, 149).

Finally, as to any claim not specifically barred by the Settlement Agreement, the State's vague and conclusory allegations fail to satisfy Alabama pleading requirements and should be dismissed under Rules 9(b) and 12(b)(6). *See* Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss the First Amended Complaint. The Amended Complaint does not make a single fact allegation specifically that Bayer Corp., Bayer Pharmaceuticals, or Bayer Healthcare falsely reported the AWPs for any of their drugs. In addition, the only

---

[2] Notably, in light of the 2001 settlement agreements with the 47 States, numerous State Attorneys General have declined to name Bayer in AWP actions they have instituted, or have dismissed Bayer from the actions after initially naming it. *See California ex rel. Ven-A-Care v. Abbott Labs., Inc., et al.,* No. CV03-2238-DT (C.D. Cal.); *Connecticut v. GlaxoSmithKline PLC,* No. 3:03-CV-0553 (D. Conn.); *Connecticut v. Pharmacia Corp.,* No. 3:03-CV-0554 (D. Conn.); *Connecticut v. Aventis Pharms., Inc.,* No. 3:03-CV-0557 (D. Conn.); *Connecticut v. Dey, Inc. et al.,* No. 3:03-CV-0572 (D. Conn.); *Minnesota v. Pharmacia,* No. 02-CV-1779 (D. Minn.); *Missouri v. Dey, L.P., et al.,* (Cir. Ct. St. Louis City May 11, 2005); *New York v. GlaxoSmithKline PLC,* No. 03-CV-0299 (N.D.N.Y.); *New York v. Pharmacia Corp.,* No. 03-CV-0295 (N.D.N.Y.); *New York v. Aventis Pharms., Inc.,* No. 03-CV-0305 (N.D.N.Y.); *West Virginia v. Warrick Pharms., et al.,* (Kanawa Co. Cir. Ct).

Another State, Wisconsin, initially sued Bayer, but then voluntarily dismissed it after the 2001 settlement was brought to its attention. *State of Wisconsin v. Abbott Labs., Inc., et al.,* No. 04 CV 1709 (Cir. Ct. Dane Cty.) (Stipulation for Dismissal of Bayer Corporation, Jan. 10, 2005).

paragraph in which the Amended Complaint makes fact allegations specifically against Bayer Corp. involves the very 2001 Agreement that bars the State's claims.[3] (Am. Cmplt. ¶ 123.) The State should not be permitted to proceed against the Bayer Defendants where the only allegations it makes with even minimal specificity are directed at conduct for which the State entered into a broad release in 2001.

## CONCLUSION

For the foregoing reasons, and those presented in Defendants' Joint Memorandum, the State's First Amended Complaint against Bayer Corp., Bayer Pharmaceuticals and Bayer Healthcare should be dismissed with prejudice.

Dated: June 28, 2005

Respectfully submitted,

F.M. Haston, III (HAS012)
BRADLEY ARANT ROSE & WHITE
One Federal Place
1819 Fifth Ave. North
Birmingham, AL 35203-2104
Telephone: (205) 521-8303
Facsimile: (205) 488-6303

Attorney for Defendants Bayer Corporation, Bayer Pharmaceuticals Corporation, and Bayer Healthcare, LLC

Of counsel:

Richard D. Raskin
Michael Doss
SIDLEY AUSTIN BROWN & WOOD LLP
10 S. Dearborn Street
Chicago, IL 60603
312-853-7000
Fax: 312-853-7036

---

[3] The State also wrongly attempts to buttress its claims by referencing a separate 2003 settlement between Bayer Corp., the federal government and the states, including Alabama. (Am. Cmplt. ¶ 123.) This 2003 settlement had *nothing* to do with AWP, and the Complaint does not allege otherwise. Instead, this settlement involved "best price" claims, which the Complaint admits are not involved in this case. (*Id.*)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing *BAYER CORPORATION, BAYER PHARMACEUTICALS CORPORATION, AND BAYER HEALTHCARE, LLC' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS* ("the Memorandum") upon the following counsel for the State of Alabama

Troy King, Attorney General
State of Alabama
300 State House
11 South Union Street
Montgomery, Alabama 36130

Roger L. Bates
Hand, Arendall, L.L.C.
1200 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203

Caine O'Rear III
Windy C. Bitzer
Hand Arendall, L.L.C.
Post Office Box 123
Mobile, Alabama 36601

Jere L. Beasley
W. Daniel Miles, III
Clinton C. Carter
Beasley, Allen Crow, Methvin,
Portis & Miles, PC
P. O. Box 4160
Montgomery, Alabama 36103-4160

by placing a copy in the United States Mail, postage prepaid, and properly addressed to them on this the 28th day of June, 2005.

I further certify that, in accordance with an agreement among defense counsel, I have served a copy of the Memorandum by electronic mail upon counsel for each of the remaining parties listed below on the same date.

OF COUNSEL

**Abbott Laboratories, Inc.**
Toni Ann Citera
Jones Day
222 East 41st Street
New York, New York 10017-6702

James R. Daly
Jeremy P. Cole
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, Illinois 60601

Betsy Collins
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

**Alcon Laboratories, Inc.**
Edward S. Sledge, III
Archibald Reeves, IV
McDowell Knight Roedder & Sledge, L.L.C.
63 South Royal Street
Suite 900
Mobile, Alabama 36602

**Allergan, Inc.**
Richard Raskin
Michael Doss
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603

F.M. Haston, III
Bradley Arant LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203

**Alpharma, Inc.**
**PurePac Pharmaceutical Co.**
John R. Fleder
Hyman, Phelps & McNamara, P.C.
700 Thirteenth Street, N.W., Suite 1200
Washington, D.C. 20005

Steven F. Casey
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201-0306

**Amgen Inc.**
Joseph H. Young
Steven F. Barley
Hogan & Hartson, LLP
111 S. Calvert Street, Suite 1600
Baltimore, Maryland 21202

Anthony A. Joseph
Johnston Barton Proctor & Powell LLP
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618

**Andrx Corporation**
**Andrx Pharmaceuticals, Inc.**
Robert J. Muldoon, Jr.
James W. Matthews
Katy E. Koski
Sherin Lodgen LLP
101 Federal Street
Boston, MA 02110

James H. Anderson
Beers, Anderson, Jackson, Patty
& Van Heest, P.C.
P.O. Box 1988
Montgomery, AL 36102

**AstraZeneca Pharmaceuticals LP**
**AstraZeneca LP**
D. Scott Wise
Michael Flynn
Kim Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

Tom Christian
Sharon Stuart
Christian & Small
1800 Financial Center
505 North 20th Street
Birmingham, Alabama 35203

**Aventis Pharmaceuticals Inc.**
Carlos Provencio
Shook Hardy & Bacon L.L.P.
Hamilton Square
600 14th Street, N.W.
Suite 800
Washington, D.C. 20005-2004

Michael Koon
Joseph Matye
Nicola Heskett
Shook Hardy & Bacon L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108

Richard H. Gill
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street
Post Office Box 347
Montgomery, Alabama 36101-0347

**Aventis Behring, LLC**
**ZLB Behring, LLC**
William D. Nussbaum
Jonathan T. Rees
Gregory Petouvis
Hogan & Hartson, LLP
555 Thirteenth Street, NW
Washington, DC 20004

Richard H. Gill
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street
Post Office Box 347
Montgomery, Alabama 36101-0347

**Barr Laboratories, Inc.**
Karen Walker
Pamela Auerbach
Sean Trende
Kirkland & Ellis LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005

Bruce F. Rogers
Bainbridge, Mims, Rogers & Smith LLP
600 Luckie Drive
Post Office Box 530886
Birmingham, Alabama 35253

**Baxter International**
**Baxter Healthcare Corporation**
Merle DeLancey
Tina Reynolds
Jason D. Wallach
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, DC 20037-1526

Rushton McClees
Sirote & Permutt, P.C.
2311 Highland Avenue
Birmingham, Alabama 35205

**Bayer Corporation**
**Bayer Pharmaceuticals Corporation**
**Bayer Healthcare, LLC**
Richard Raskin
Michael Doss
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603

F.M. Haston, III
Bradley Arant LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203

**Biovail Pharmaceuticals, Inc.**
F.M. Haston, III
Bradley Arant LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203

**Boehringer Ingelheim Corporation**
**Boehringer Ingelheim Pharmaceuticals**
**Roxane Labs, Inc.**
Paul Coval
Douglas L. Rogers
Darrell A. H. Miller
Vorys Sater Seymour & Pease LLP
52 East Gay Street
Post Office Box 1008
Columbus, Ohio 43216-1008

Sandy Robinson
Cabaniss, Johnston, Gardner, Dumas & O'Neal
Post Office Box 2906
Mobile, Alabama 36652

**Bristol-Myers Squibb Co.**
Lyndon M. Tretter
Steven M. Edwards
James Zucker
Hogan & Hartson L.L.P.
875 Third Avenue
New York, New York 10022

Harlan I. Prater, IV
Lightfoot, Franklin & White, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203-3200

**Dey, L.P.**
Paul F. Doyle
Christopher C. Palermo
Neil Merkl
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Joseph W. Letzer
Gary M. London
Burr & Forman LLP
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203

**Eisai, Inc.**
Brien T. O'Connor
E. Abim Thomas
Ropes & Gray LLP
One International Place
Boston, MA 02110

Julia Boaz Cooper
BRADLEY, ARANT, ROSE & WHITE, LLP
1819 5th Avenue North
Birmingham, Alabama 35203-2104

**Eli Lilly and Company**
William Davis
Mitz, Levin, Cohen, Ferris
Glovsky & Popeo
701 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20004

Tabor R. Novak, Jr.
Ball, Ball, Matthews & Novak, P.A.
2000 Interstate Park Drive
Suite 204
Montgomery, Alabama 36109

**Endo Pharmaceuticals, Inc.**
Jonathan Stern
Arnold & Porter
Thurman Arnold Building
555 Twelfth Street, NW
Washington, DC 20004-1206

Lawrence Clark
Adams & Reese LLP
Concord Center
2100 Third Avenue North
Suite 1100
Birmingham, Alabama 35203

**ETHEX Corporation**
Robert S. Litt
Justin Antonipillai
Michael Rinaldi
Arnold & Porter
Thurman Arnold Building
555 Twelfth Street, NW
Washington, DC 20004-1206

Lawrence Clark
Robert Eckinger
Michael Wade
Adams & Reese LLP
Concord Center
2100 Third Avenue North
Suite 1100
Birmingham, Alabama 35203

**Forest Laboratories, Inc.**
**Forest Pharmaceuticals, Inc.**
Peter Venaglia
Brian Rafferty
Dornbush Schaeffer, Strongin
& Weinstein, LLP
747 Third Avenue
New York, New York 10017

William Hardie
Johnstone Adams
Post Office Box 1988
Mobile, Alabama 36633-1988

**Fujisawa Healthcare, Inc.**
**Fujisawa USA, Inc.**
Kathleen McGuan
Andrew Hurst
Reed Smith LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, DC 20005

Richard L. Sharff, Jr.
Bradley, Arant, Rose & White
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104

**Genzyme Corporation**
Brien T. O'Connor
Eric Christofferson
Ropes & Gray LLP
One International Place
Boston, MA 02110

Julia Boaz Cooper
BRADLEY, ARANT, ROSE & WHITE, LLP
1819 5th Avenue North
Birmingham, Alabama 35203-2104

**Gilead Sciences, Inc.**
Robert S. Litt
Jessica Medina
Rebecca Dubin
Arnold & Porter LLP
Thurman Arnold Building
555 Twelfth Street, NW
Washington, DC 20004-1206

Lawrence Clark
Robert Eckinger
Michael Wade
Adams & Reese LLP
Concord Center
2100 Third Avenue North
Suite 1100
Birmingham, Alabama 35203

**Hoffmann-La Roche Inc.**
Kevin Sullivan
Grace Rodriguez
John Shakow
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

Edward S. Sledge, III
Archibald T. Reeves, IV
McDowell, Knight, Roedder & Sledge, LLC
Post Office Box 350
Mobile, Alabama 36601

**Immunex Corporation**
David J. Burman
Kathleen M. O'Sullivan
Zoe Philippides
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099

W. Stancil Starnes
Starnes & Atchison LLP
7th Floor
100 Brookwood Place
Post Office Box 598512
Birmingham, AL 35259-8512

**IVAX Corporation**
**IVAX Pharmaceuticals, Inc.**
Bruce Wessel
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067-4276

George W. Walker, III
Copeland, Franco, Screws & Gill, P.A.
Montgomery, AL 36101-0347

**Johnson & Johnson**
**ALZA Corporation**
**Janssen Pharmaceutica Products, L.P.**
**McNeil-PPC, Inc.**
**Ortho Biotech Products, L.P.**
**Ortho-McNeil Pharmaceutical, Inc.**
William F. Cavanaugh
Andrew D. Schau
Erik Haas
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Robert F. Northcutt
James H. McLemore
Capell & Howard, P.C.
150 South Perry Street [36104]
Post Office Box 2069
Montgomery, Alabama 36102-206

**K-V Pharmaceutical Company**
Robert S. Litt
Justin Antonipillai
Michael Rinaldi
Arnold & Porter
Thurman Arnold Building
555 Twelfth Street, NW
Washington, DC 20004-1206

Lawrence Clark
Robert Eckinger
Michael Wade
Adams & Reese LLP
Concord Center
2100 Third Avenue North
Suite 1100
Birmingham, Alabama 35203

**King Pharmaceuticals, Inc.**
**Monarch Pharmaceuticals, Inc.**
Gary Greenberg
Louis J. Scerra, Jr.
Greenberg Traurig, LLP
One International Place
Boston, MA 02110

Lisa Borden
Baker Donelson Bearman Caldwell & Berkowitz, P.C.
1600 SouthTrust Tower, 420 20th Street
Birmingham, Alabama 35203

Sam Blair
John Starnes
Baker Donelson Bearman Caldwell & Berkowitz, P.C.
165 Madison Avenue
Suite 2000
Memphis, TN 38103

**MedImmune, Inc.**
Steve Umin
James Hayes
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Lee H. Copeland
Copeland, Franco, Screws & Gill, P.A.
Post Office Box 347
Montgomery, Alabama 36101-0347

**Merck & Co., Inc.**
John Townsend
Robert Reznick
Robert Funkhouser
Hughes Hubbard & Reed LLP
1775 I Street N.W.
Washington, DC 20006-2401

Robert C. Brock
Robert Huffaker
Rushton, Stakely, Johnson & Garrett, P.A.
P.O. Box 270
Montgomery, AL 36101-0270

**Mylan Laboratories Inc.**
**Mylan Pharmaceuticals Inc.**
**UDL Laboratories, Inc.**
Gary Greenberg
Louis J. Scerra, Jr.
Greenberg Traurig, LLP
One International Place
Boston, MA 02110

David Long-Daniels
Greenberg Traurig, LLP
3290 Northside Parkway, Suite 400
Atlanta, Georgia 30327

**Novartis Pharmaceuticals Corporation**
Saul Morgenstern
Jane W. Parver
Mark Godler
Kay Scholer LLP
425 Park Avenue
New York, New York 10022-3598

William D. Coleman
James N. Walter, Jr.
Capell & Howard, P.C.
Post Office Box 2069
Montgomery, Alabama 36102

**Novo Nordisk**
Richard Raskin
Michael Doss
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603

F.M. Haston, III
Bradley, Arant LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203

**Organon Pharmaceuticals USA**
William Campos
David Covey
Sedgwick, Detert, Moran & Arnold LLP
125 Broad Street
New York, New York 10004

Edward S. Sledge, III
Archibald T. Reeves, IV
McDowell, Knight, Roedder & Sledge, LLC
Post Office Box 350
Mobile, Alabama 36601

**Par Pharmaceutical, Inc.**
Richard Cooper
Paul K. Dueffert
Thomas J. Roberts
Catherine Levy
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005

George W. Walker
Copeland, Franco, Screws & Gill, P.A.
Post Office Box 347
Montgomery, Alabama 36101-0347

**Pfizer Inc.**
**Agouron Pharmaceuticals, Inc.**
**Pharmacia Corporation**
**Pharmacia & Upjohn Company**
**G.D. Searle, LLC**

Scott Stempel
Morgan Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

John C. Dodds
Kimberly K. Heuer
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, Pennsylvania 19103

Philip H. Butler
George R. Parker
Bradley, Arant, Rose & White LLP
Alabama Center for Commerce Bldg.
401 Adams Avenue, Suite 780
Montgomery, Alabama 36104

**Purdue Pharma, L.P.**
Lori A. Schechter
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482

Harlan Prater
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 20th Street North
Birmingham, Alabama 35203-3200

**Roche Laboratories, Inc.**
Kevin Sullivan
Grace Rodriguez
John Shakow
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706

Edward S. Sledge, III
Archibald T. Reeves, IV
McDowell, Knight, Roedder & Sledge, LLC
Post Office Box 350
Mobile, Alabama 36601

**Sandoz, Inc.**
Wayne Cross

Michael Gallagher
Brendan Woodard
White & Case
1155 Avenue of the Americas
New York, New York 10036-2787

C. Clay Torbert, III
Capell & Howard, P.C.
150 South Perry Street
Montgomery, Alabama 36104

**Sanofi-Synthelabo Inc.**
Kevin Sullivan
Grace Rodriguez
John Shakow
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706

Richard H. Gill
Copeland, Franco, Screws & Gill, P.A.
Post Office Box 347
Montgomery, Alabama 36101-0347

**Schering-Plough Corporation**
**Warrick Pharmaceuticals Corporation**
Brien T. O'Connor
John T. Montgomery
Ropes & Gray LLP
One International Place
Boston, MA 02110

J. Steven Baughman
Christopher May
Ropes & Gray LLP
One Metro Center
700 12th Street N.W., Suite 900
Washington, D.C. 20005

John A. Henig, Jr.
Copeland, Franco, Screws & Gill, P.A.
P.O. Box 347
Montgomery, AL 36101-0347

**SmithKline Beecham Corporation**
**d/b/a GlaxoSmithKline**

Joseph P. Babington
HELMSING LEACH HERLONG NEWMAN & ROUSE
150 Government St.
Suite 2000
Mobile, Alabama 36602
Telephone: (251) 432-5521
Facsimile: (251) 432-0633

Mark H. Lynch
Geoffrey E. Hobart
Ronald G. Dove, Jr.
COVINGTON & BURLING
1201 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

Frederick G. Herold
DECHERT LLP
1117 California Avenue
Palo Alto, CA 94304
Telephone: (650) 813-4930
Facsimile: (650) 813-4848

Thomas H. Lee II
DECHERT LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Telephone: (215) 994-2994
Facsimile: (215) 994-2222

Mark D. Seltzer
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

Counsel for Defendant SmithKline Beecham
Corporation dba GlaxoSmithKline

**Takeda Pharmaceuticals North America, Inc.**
Robert Stauffer
Anthony C. Porcelli
Jenner & Block LLP
1 IBM Plaza
Suite 4200
Chicago, Illinois 60611

Joseph C. Espy, III
Melton, Espy & Williams
Post Office Drawer 5130
Montgomery, Alabama 36103

**TAP Pharmaceutical Products, Inc.**
Toni Ann Citera
Jones Day
222 East 41st Street
New York, New York 10017-6702

James R. Daly
Jeremy P. Cole
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, Illinois 60601

Betsy Collins
Leah Poyntner
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

**TEVA Pharmaceutical Industries LTD.**
Elizabeth I. Hack
Elizabeth Finberg
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW
Suite 1600 East Tower
Washington, DC 20005

W. Joseph McCorkle, Jr.
Balch & Bingham, LLP
2 Dexter Avenue
Montgomery, AL 36104

F. Inge Johnstone
Balch & Bingham LLP
1710 6th Avenue North
P.O. Box 306
Birmingham, AL 35201-0306

**Watson Pharmaceuticals, Inc.**
**Watson Laboratories, Inc.**
**Watson Pharma, Inc.**
Douglas B. Farquhar
Hyman, Phelps & McNamara, P.C.
700 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005

Steven F. Casey
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201-0306

**Wyeth Pharmaceuticals, Inc.**
**Wyeth, Inc.**
Craig Holden
Kelly Davidson
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, Maryland 21202-1643

Maibeth J. Porter
Lee E. Bains, Jr.
Maynard, Cooper & Gale, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618

Peck Fox
Maynard, Cooper & Gale, P.C.
201 Monroe Street
Suite 1650
Montgomery, Alabama 36104-3720

## State Settlement Agreement

### Part I: Parties

This Settlement Agreement (hereinafter the "Agreement") is entered into by and between the STATE OF ALABAMA (hereinafter the "STATE") and BAYER Corporation (hereinafter "BAYER") (hereinafter collectively referred to as the "Parties") through their authorized representatives.

### Part II: Preamble

As a preamble to this Agreement, the Parties agree to the following:

A. BAYER Corporation is a corporation organized under the laws of Indiana. Its headquarters are in Pittsburgh, Pennsylvania. BAYER is a manufacturer of pharmaceutical and biological products. Miles, Inc. and Cutter Laboratories, Inc. (which along with BAYER Corporation, shall be referred to hereafter as "BAYER"), were predecessor organizations that ultimately were merged into the company that became known as BAYER Corporation. At all relevant times, BAYER manufactured, marketed and sold certain drugs and biological products to – among others – (1) healthcare providers, (2) "full-line" drug wholesalers, and (3) specialized drug wholesalers sometimes called "distributors."

B. The STATE contends that BAYER caused to be submitted claims for payment to the STATE's Medicaid Program, established by Title XIX of the Social Security Act.

C. The STATE contends that it has civil claims against BAYER under various state statutes and common law for engaging in the following conduct during the period January 1993 through August 1999 involving the marketing and sale of Koate-HP



EXHIBIT A

Antihemophilic Factor (Human), Kogenate Antihemophilic Factor (Recombinant), Konyne-80 Factor IX Complex (Human), Gamimune N, 5% Immune Globulin Intravenous (Human, 5%), Gamimune N, 10% Immune Globulin Intravenous (Human, 10%), and Thrombate III Antithrombin III (Human) (collectively referred to hereafter as the Qui Tam Drugs):

i) The STATE contends that BAYER, in a manner similar to the practices of certain other manufacturers, knowingly and intentionally engaged in a marketing scheme whereby it set the Average Wholesale Prices ("AWPs") of the Qui Tam Drugs at levels far higher than what the vast majority of its customers actually paid for these products when purchasing either directly from BAYER or through a wholesaler. Because the majority of Medicaid programs use AWP as a benchmark in determining reimbursement rates, the STATE contends that as a result of BAYER's actions, BAYER's customers received reimbursement from state Medicaid programs at levels far higher than their actual costs.

ii) The STATE also contends that BAYER knowingly and intentionally misled certain state Medicaid programs that reimburse on the basis of Wholesale Acquisition Cost ("WAC") by, among other actions, representing to third party reporting services such as First DataBank and Medi-Span that it did not sell the Qui Tam Drugs through wholesalers and by misleading Medicaid officials about the prices it charged to wholesale purchasers in order to avoid reporting accurate

wholesale or distributor price information that would have affected the reimbursement levels of the Qui Tam Drugs in states that use WAC as the reimbursement benchmark. As a result, the STATE contends that BAYER's customers received reimbursement from the state Medicaid programs at levels far higher than their actual costs.

iii) The STATE also contends that BAYER knowingly and intentionally misled certain state Medicaid programs that rely on actual acquisition cost information about the prices at which BAYER sold the Qui Tam Drugs to its customers, including home health agencies. The STATE alleges that BAYER did so by falsely reporting its prices on surveys and by providing invoices to home health companies that did not reflect the actual net cost of the Qui Tam Drugs to customers. As a result, the STATE contends that BAYER's customers received reimbursement from the state Medicaid programs at levels far higher than their actual costs.

iv) The STATE contends that BAYER knowingly and intentionally misreported and underpaid its Medicaid Rebates for the Qui Tam drugs, *i.e.*, the amounts that it owed to the Medicaid program under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8. BAYER generally was required on a quarterly basis to rebate to each state Medicaid program the difference between the Average Manufacturer Price and "Best Price," as defined by 42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C). The STATE alleges that BAYER misreported and

underpaid its Medicaid rebates to all states by calculating its Best Prices for the Qui Tam Drugs without factoring in the value of discounts, rebates, short-dated goods discounts, unrestricted educational grants, free goods, chargebacks, and other price reductions which were not disclosed to the states or the federal government or the Medicaid programs.

BAYER's conduct and transactions referenced herein Paragraph II(C)(i-iv) are hereinafter referred to as the "Covered Conduct."

D. The STATE contends that it has certain administrative claims against BAYER for administrative and monetary penalties under state and federal law for the Covered Conduct.

E. BAYER denies the STATE's contentions as set forth in Paragraphs II (B – D) and denies that it has any liability relating to these allegations.

F. In order to avoid the delay, uncertainty, inconvenience and expense of protracted litigation of these claims, and as a result of mutual desire to settle their disputes, the Parties reach a full and final settlement as set forth below.

G. This Agreement does not constitute an admission by BAYER or evidence of any liability or wrongful conduct.

H. Concurrent with this Agreement, BAYER is entering into a settlement agreement regarding the Covered Conduct with the United States of America and with the relator (the "Relator") in a lawsuit filed pursuant to the qui tam provisions of the federal False Claims Act, Civil Action No. 95-95-1354 (S.D. Fla., under seal), and BAYER also is entering into a Corporate Integrity Agreement with the Office of

Inspector General of the United States Department of Health and Human Services and into similar settlement agreements with numerous other states.

**Part III: Terms and Conditions**

NOW, THEREFORE, in consideration of the mutual promises, covenants, and obligations set forth below, and for good and valuable consideration as stated herein, the Parties agree as follows:

1. (a) BAYER agrees to pay the United States, the individual states and the Relator the maximum collective sum of fourteen million dollars ($14,000,000) (the "Settlement Amount"). BAYER agrees to make payment of the federal share of the Settlement Amount and the Relator's share of the Settlement Amount pursuant to the terms of BAYER's separate settlement agreement with the United States and the Relator. BAYER agrees to pay the maximum sum of six million, one hundred seventy-two thousand dollars ($6,172,000) of this total (the "Total State Settlement Amount"), representing the state-funded portions of the claims settled for the participating states' Medicaid programs, to the participating states identified on Exhibit "A" to this Agreement. The STATE's share of the Total State Settlement Amount is $83,759.46 (the "Individual State Settlement Amount").

   (b) Within three business days of the Effective Date of the federal settlement agreement, the Effective Date of the Corporate Integrity Agreement or the execution of an escrow agreement with the State of New York, whichever is later, BAYER shall deposit the Total State Settlement Amount in an interest bearing escrow account under the custody and control of the State of New

York Medicaid Fraud Control Unit, which shall act as Escrow Agent and shall retain such funds until their release in accordance with the payment terms set forth in c).

(c) The STATE shall be entitled to disbursement of its Individual State Settlement Amount from the escrow account ten days after receipt by the Escrow Agent of a copy of this Agreement executed by both the STATE and BAYER; provided, however, that the STATE shall not be entitled to disbursement of the Individual State Settlement Amount until the Escrow Agent has received fully executed state settlement agreements from all those states identified on Exhibit "B" (the "Threshold States"). Any escrowed funds not disbursed within 200 days after the Escrow Agent has received the Total State Settlement Amount shall be disbursed to BAYER.

2) Subject to the exceptions in Paragraph III(6) below, in consideration of the obligations of BAYER set forth in this Agreement, conditioned upon BAYER's payment in full of the Individual State Settlement Amount, the STATE (on behalf of itself, its officers, agents, agencies and departments) agrees to release BAYER, its parent corporation(s), subsidiaries and affiliates, predecessors, successors and assigns as well as its current and former directors, officers, employees, agents and shareholders from any civil or administrative monetary claim, action, suit or proceeding the STATE has or may have under any source of law for the Covered Conduct. The payment of this settlement amount fully discharges BAYER from any obligation to pay restitution, damages, and or any fine or penalty to the STATE for the Covered Conduct.

3) In consideration of the obligations of BAYER set forth in this Agreement, conditioned upon BAYER's payment in full of the Individual State Settlement Amount, the STATE agrees to release and refrain from instituting, directing or maintaining any administrative claim or any action seeking exclusion from the Medicaid program against BAYER, its parent corporation(s), subsidiaries and affiliates, predecessors, successors and assigns as well as its current and former directors, officers, employees, agents and shareholders for the Covered Conduct as relates to the STATE's Medicaid program, except as reserved in Paragraph III(6), below, and as reserved in this Paragraph.

4) In the event that any person(s) has(have) filed any qui tam "whistleblower" actions under the laws of the STATE relating to the Covered Conduct, it is the STATE's understanding that: such person(s) shall take such actions as are necessary and appropriate to dismiss said actions against BAYER and secure state court approvals, to the extent necessary, of this Agreement; and, the STATE agrees that it shall negotiate in good faith with the person(s) as to the person's(s') share in connection with the state action. In the event that an agreement cannot be reached, the STATE agrees that it shall submit that issue to the state court having jurisdiction. The STATE shall also join in any necessary motions before the state court to secure approvals of this Agreement.

5) BAYER fully and finally releases the STATE, its agencies, employees, servants, and agents from any claims (including attorneys fees, costs, and expenses of every kind and however denominated) which BAYER has asserted, could have asserted, or may assert in the future against the STATE, its agencies, employees, servants, and agents,

related to the Covered Conduct and the STATE's investigation and prosecution thereof.

6) Notwithstanding any other terms of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including BAYER) are any and all of the following:

(a) Any civil, criminal or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code) or the STATE's Revenue Code;

(b) Any criminal liability;

(c) Except as explicitly stated elsewhere in this Agreement, any administrative liability, including mandatory exclusion from any state health care programs;

(d) Any civil or administrative liability that BAYER has or may have under any state statute, regulation or rule not released in Paragraph III(2) above;

(e) Any claims based upon such obligations as are created by this Agreement;

(f) Any express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services, provided by BAYER;

(g) Any claims for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

(h) Any claims based on a failure to deliver items or services due; and,

(i) Any civil or administrative claims against individuals, including current or former directors, officers, employees, agents or shareholders of defendant BAYER, who are criminally convicted in relation to the Covered Conduct.

7) BAYER has entered into a Corporate Integrity Agreement with the Office of the Inspector General of the United States Department of Health and Human Services ("OIG"), the goal of which is to ensure the accurate and complete communication of drug pricing information to specified drug price reporting services and the states. BAYER acknowledges that the OIG may share information provided under the Corporate Integrity Agreement with the STATE and that the Corporate Integrity Agreement does not preclude the STATE from taking any appropriate action against BAYER for future conduct under the STATE's laws.

8) BAYER shall report certain drug and biological product pricing information to the STATE's Medicaid Program as set forth herein for the purpose of furnishing the STATE with true pricing information that accurately reflects the prices at which actual purchasers buy the drug and biological products sold by BAYER. BAYER understands that this information may be relied upon by the STATE in establishing reimbursement rates for drugs and biological products.

   a) Price Reporting: Thirty days after the last day of each calendar quarter, BAYER shall report, in accordance with sub-paragraph (b), the average sale price of each of its drugs and biological products identified by BAYER'S NDC codes that are or shall be reimbursed by the STATE's Medicaid Program, to First DataBank and to the STATE's Medicaid Program, except that the first such report shall be submitted on February 28, 2001, or fifteen days after the Effective Date of this Agreement, whichever is later. If appropriate to reflect changes in the sources from which the STATE's Medicaid program

receives its pricing information, BAYER agrees that, upon the receipt of a written request from the STATE, it will report the prices to a drug pricing reporting source other than, and in addition to, First DataBank, subject to reasonable provisions equivalent to those in place with First DataBank to ensure the confidentiality of that information.

b) Average Sale Price Reporting Procedure: The price reported by BAYER with respect to each dosage form, strength and volume of the drug or biological product (without regard to any special packaging, labeling, or identifiers on the dosage form or product or package), shall be the average of all final sale prices charged by BAYER for the drug or biological product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Rebate Program purposes, pursuant to 42 USC § 1396r-8, and direct sales to hospitals. The prices identified in the calculation of the average sale price should be net of all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates* and all other price concessions provided by BAYER to any relevant purchaser, as earlier defined in this paragraph, that result in a reduction of the ultimate cost to the purchaser. Notwithstanding the foregoing, the average sale price shall not include the value of bona fide charity care or grants. The average sale price reported shall be properly weighted to reflect

the volume of sales at each sale price, *i.e.*, for each NDC code, the price reported shall be an average per unit price determined by dividing the sum of all final prices charged by BAYER, net of all price reductions as defined above, for a drug or biological product in a quarter by the total number of units of that drug or biological product sold in that quarter. The methodology by which BAYER has calculated average sale prices in accordance with these standards shall be identified to the STATE as provided in Paragraph III.8(d).

c) Limitations on Reporting of Average Wholesale Price: With respect to the Qui Tam Drugs, BAYER shall not report an AWP to First DataBank, or any other reporting service, to be used for purposes of setting Medicaid reimbursement prices for the Qui Tam Drugs, and BAYER shall expressly inform such reporting services to this effect. This restriction shall not limit BAYER's ability to report AWP information for the Qui Tam Drugs to price reporting services for uses unrelated to Medicaid, or its ability to report AWP information for any purposes for drugs or biological products other than the Qui Tam drugs.

d) Certification Requirement: With each report of average sale price information BAYER sends to the STATE Medicaid Agency, BAYER shall also provide a detailed description of the methodology used to calculate the average sale price. A high managerial agent of BAYER

* The term "rebate" as used here is not understood to include any payments made by BAYER to the States pursuant to the Medicaid Rebate Program.

will certify that the average sale prices reported therein are the prices that have been reported to First DataBank, or any successor reporting agency, and that they have been calculated in accordance with the described methodology. Said certification shall be in the form annexed to this Agreement and shall include an acknowledgment that the average sale prices reported will be filed with and used in the administration of the STATE's Medicaid program. To the extent that BAYER's methodology involves accruing for the impact of future events, BAYER shall include a description of its accrual methodology in its certification, and shall on a quarterly basis evaluate such methodology in light of its actual experience and make any appropriate adjustments.

e) It is understood that BAYER considers the average sale price information and the methodology by which it is calculated to be confidential commercial information and proprietary trade secrets that if disclosed would cause substantial injury to the competitive position of BAYER. It is further understood, however, that all information provided by BAYER to the STATE Medicaid Program pursuant to this Agreement shall be made available to the STATE's MFCU upon request.

f) BAYER agrees to submit average sale price information in accordance with this paragraph for a period of five years from the Effective Date of this Agreement.

g) BAYER shall retain all workpapers and supporting documentation relating to the average sale prices of its drugs for six years after the date of each certification and will make such documentation available for inspection by the STATE's Medicaid Program and the STATE's MFCU.

9) BAYER waives and will not assert any defenses BAYER may have to any criminal prosecution or administrative action relating to the Covered Conduct, which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the United States Constitution or any corresponding section of the STATE's Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the United States Constitution or the corresponding section of the STATE's Constitution, this settlement bars a remedy sought in such criminal prosecution or in any administrative action that has not been released pursuant to this Agreement.

10) BAYER covenants to cooperate fully and truthfully with the STATE in any ongoing investigation or investigation commenced within five years of the Effective Date of this Agreement of individuals and entities not specifically released by this Agreement (including any parties with whom BAYER has or has had a business or professional relationship, including but not limited to vendors, contractors, partners, joint venturers, physicians, and referral sources) relating to the Covered Conduct. More specifically, upon reasonable request from the STATE:

(a) BAYER will make reasonable efforts to facilitate access to, and encourage the cooperation of, its current and former directors, officers, and

employees for interviews and testimony relating to the Covered Conduct, consistent with the rights and privileges of such individuals. To encourage the cooperation of such individuals, BAYER agrees to advise such individuals in writing that the STATE wishes to interview them or seek their testimony, and that the individuals' cooperation is in the best interest of BAYER. Cooperation provided pursuant to this subparagraph will include identification of witnesses who, to BAYER's knowledge, may have material information related to the STATE's inquiry. The testimony referred to in this paragraph includes, but is not limited to, testimony deemed necessary by the STATE or a court to identify or establish the source, original location, authenticity, or other evidentiary foundation for any documents and to authenticate such documents in any criminal, civil and administrative investigations and proceedings in which the STATE is involved.

(b) BAYER will provide copies of non-privileged documents and records in its possession, custody or control relating to the Covered Conduct and relating to the subject of the STATE's inquiry. In connection with this, BAYER shall provide such technical assistance as is necessary to facilitate the STATE's access to any computerized information covered by this Paragraph.

(c) Nothing in this agreement shall be construed as a waiver by BAYER of its attorney-client privilege or work product privilege. Notwithstanding that

fact, the existence of any such privilege does not affect BAYER'S obligation to comply with this Agreement.

11) This Agreement is intended to be for the benefit of the Parties only and, except as stated herein, the Parties do not by this instrument release any claims against any other person or entity, including any individual or entity that purchased drugs or biological products from BAYER.

12) The STATE acknowledges BAYER's cooperation in the STATE's investigation of drug pricing practices and agrees to communicate the nature and extent of this cooperation to other parties upon the request of BAYER. The making of this Agreement, and BAYER's provision of information pursuant to it, shall not be construed by the STATE as a basis for the exclusion of any of BAYER's products from the STATE's formulary.

13) Concurrent with the execution of this Agreement and payment of the Settlement Amount, the STATE agrees to dismiss with prejudice any lawsuit against BAYER, including any STATE qui tam "whistleblower" lawsuit currently pending against BAYER in the courts of the STATE, relating to the Covered Conduct.

14) Nothing in this Agreement shall be construed to abrogate or alter any existing obligation of BAYER pursuant to State law.

15) This Agreement, including all exhibits, constitutes the complete agreement between the Parties and may not be amended except by written consent of the Parties.

16) Each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

17) This agreement is governed by the laws of the State of Alabama.

18) Unless otherwise stated in writing subsequent to the Effective Date of this Agreement, all notifications and communications made pursuant to this Agreement shall be submitted to the entities listed below:

**STATE :**

**[For the submission of average sale price data]**

**Pharmacy Director**
**Alabama Medicaid Agency**
**501 Dexter Avenue**
**Montgomery, Alabama 36104**

**[For legal notices and all other purposes]**

**State of Alabama**
**Office of the Attorney General**
**Medicaid Fraud Control Unit**
**11 South Union Street**
**Montgomery, Alabama 36130**

**BAYER:**

**Assistant General Counsel**
**Bayer Corporation Pharmaceutical Division**
**400 Morgan Lane**
**West Haven, CT 06516**

19) BAYER represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

20) The undersigned individuals signing this Agreement on behalf of BAYER represent and warrant that they are authorized by BAYER to execute this Agreement. The undersigned STATE signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

21) Each party agrees to perform any further acts and to execute and deliver any further documents reasonably necessary to carry out this Agreement. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

22) The parties have read the foregoing Agreement and accept and agree to the provisions contained therein and hereby have caused this Agreement to be signed as of the day and date adjacent to their signature.

23) The Effective Date of this Agreement shall be the date upon which all the parties below have executed this Agreement.

**State of Alabama**
**Office of Attorney General**
**Medicaid Fraud Control Unit**

By: [signature] Date: 2/30/01

Title: Director, MFCU

**Bayer Corporation**

By: [signature] Date: 8/6/01

Title: Vice President & Asst. General Counsel

**State of Alabama Medicaid Program**

By: [signature] Date: 2/07/01

Title: Commissioner

**Sidley & Austin, Counsel for BAYER**

By: [signature] Date: 8/1/01

Paul E. Kalb, Esq.
I. Scott Bass, Esq.
Robert Fabrikant, Esq.

**Exhibit "A"**
**Participating States**

ALABAMA
ALASKA
ARKANSAS
CALIFORNIA
COLORADO
CONNECTICUT
DELAWARE
FLORIDA
GEORGIA
HAWAII
IOWA
ILLINOIS
'INDIANA
KANSAS
KENTUCKY
LOUISIANA
MASSACHUSETTS
MARYLAND
MAINE
MICHIGAN
MINNESOTA
MISSOURI
MISSISSIPPI
MONTANA
NORTH CAROLINA
NEW HAMPSHIRE
NEW JERSEY
NEW MEXICO
NEVADA
NEW YORK
OHIO
OKLAHOMA
OREGON
PENNSYLVANIA
RHODE ISLAND
SOUTH CAROLINA
SOUTH DAKOTA
TEXAS
UTAH
VIRGINIA
VERMONT
WASHINGTON
WISCONSIN
WEST VIRGINIA
WYOMING

**Exhibit "B"**
**Threshold States**

ALABAMA
ARKANSAS
CALIFORNIA
CONNECTICUT
FLORIDA
ILLINOIS
LOUISIANA
MASSACHUSETTS
MARYLAND
MICHIGAN
MINNESOTA
MISSOURI
NORTH CAROLINA
NEW JERSEY
NEW YORK
OHIO
PENNSYLVANIA
SOUTH CAROLINA
TEXAS
VIRGINIA
WASHINGTON
WISCONSIN

**Exhibit "C"**
**Certification Form**

**CERTIFICATION**

The undersigned, a high managerial agent of Bayer Corporation, hereby certifies that the attached average sale price information has been communicated to First DataBank and that it has been calculated in accordance with the methodology described herein. I further acknowledge that the average sale prices so reported will be filed with and used in the administration of the State of Alabama Medicaid program.

________________________________
Signature

________________________________
Title

________________________________
Date

CODE 2840

FILED
DEC 14 2004
RONALD A. LONGTIN, JR., CLERK
By: K. Rogers
DEPUTY

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
IN AND FOR THE COUNTY OF WASHOE

STATE OF NEVADA,

Plaintiff,

vs.

ABBOTT LABORATORIES, INC.; BAXTER INTERNATIONAL, INC.; BAXTER HEALTHCARE CORPORATION; BRISTOL-MYERS SQUIBB COMPANY; ONCOLOGY THERAPEUTICS NEWTORK CORP.; APOTHECON, INC.; DEY, INC.; GLAXOSMITHKLINE P.L.C; SMITHKLINE BEECHAM CORPORTION; GLAXO WELLCOME, INC; PHARMACIA CORPORATION; PHARMACIA & UPJOHN, INC.; and TAP PHARMACEUTICAL PRODUCTS, INC., et al.,

Defendants.
_______________________________________/

Case No. CV02-00260
Dept. No. 8

ORDER GRANTING MOTION TO DISMISS THE AMENDED COMPLAINT

Bayer Corporation (hereinafter "Bayer") presents this Court with a *Motion to Dismiss the Amended Complaint*. The State of Nevada (hereinafter "State") opposes this motion. This Court, having considered all papers and pleadings on file herein, finds and concludes as follows.

This case arose out of an industry-wide investigation into alleged average wholesale price (hereinafter "AWP") inflation by pharmaceutical companies for six drugs. These drugs are Koate-HP; Kogenate; Konyne-80; Gamimune N, 5%; Gamimune N, 10%; and



EXHIBIT
B

Thrombate III (hereinafter collectively "Qui Tam Drugs"). Bayer was the first pharmaceutical company to settle allegations of AWP inflation, and entered into a settlement agreement (hereinafter "Agreement") with the State in 2001. Pursuant to the terms of the Agreement, Bayer paid $14 million, which was to be allocated pro rata among the federal government and settling states. Accordingly, the State received approximately $11,300. Part II(C)(i-iv) of the Agreement sets forth what conduct is covered by the Agreement (hereinafter "Covered Conduct"). The Covered Conduct consists of the State's allegations that Bayer violated various state statutes and common law. Specifically, the State contends that Bayer knowingly and intentionally (1) engaged in a marketing scheme whereby it set the AWP of the Qui Tam Drugs at levels far higher than what the vast majority of its customers actually paid for these products, and since the majority of Medicaid programs use AWP as a benchmark in determining reimbursement rates, Bayer's customers received reimbursement from state Medicaid programs at levels far higher than their actual costs; (2) misled certain state Medicaid programs that reimburse on the basis of Wholesale Acquisition Cost; (3) misled certain state Medicaid programs that rely on actual acquisition cost information about the prices at which Bayer sold the Qui Tam Drugs to its customers; and (4) misreported and underpaid its Medicaid Rebates for the Qui Tam Drugs. Bayer denied all of the State's contentions, and the Agreement "does not constitute an admission by BAYER or evidence of any liability or wrongful conduct." Agreement, Part II(G).

In consideration of the Agreement, the State agreed to "release BAYER...from any civil or administrative monetary claim, action, suit or proceeding the STATE has or may have under any source of law for the Covered Conduct," subject to certain exceptions enumerated in Part III(6) of the Agreement. Id. at III(2). The Agreement went on to declare, "The payment of this settlement amount fully discharges BAYER from any obligation to pay restitution, damages, and or any fine or penalty to the STATE for the Covered Conduct." Id. The Agreement also stated, "In order to avoid the delay, uncertainty, inconvenience and expense of protracted litigation of these claims, and as a result of mutual desire to settle

their disputes, the Parties reach a full and final settlement as set forth [in the Agreement]." Id. at II(F).

After Bayer and the State entered into the Agreement, the State filed a First Amended Complaint, seeking to pursue claims against Bayer and several other pharmaceutical companies. Part of the Amended Complaint was filed by the State in a *parens patriae* capacity on behalf of its citizens relating to the same Qui Tam Drugs.[1] Thereafter, Bayer filed a Motion to Dismiss, arguing that the 2001 settlement precludes most of the State's claims and those claims not precluded by the settlement lack the particularity required by NRCP 9(b). On August 30, 2004, this Court denied Bayer's motion on the NRCP 9(b) grounds, but requested oral argument regarding the *parens patriae* claims. Oral argument was heard on November 5, 2004.

In its motion, Bayer candidly admits that the citizens of Nevada themselves are free to file suit against Bayer regarding the Qui Tam Drugs. Bayer argues, however, that the Agreement bars the State from pursuing its present claims against Bayer in a *parens patriae* capacity. Bayer asserts that the Agreement encompasses *parens patriae* claims, and such claims are not contained in the enumerated list of exclusions from the Agreement. See Agreement, Part III(6) (setting forth those claims that are specifically reserved and excluded from the scope of the Agreement). Bayer argues that *parens patriae* claims belong to the State, and thus are barred by the express terms of the Agreement. Bayer thus requests that this Court dismiss the State's First Amended Complaint.

In response, the State argues that the Agreement does not bar its claims against Bayer in a *parens patriae* capacity because the release of liability did not encompass *parens patriae* claims. The State concedes that it cannot recover its own damages regarding any Bayer medicine for the time period after the date of the Agreement, nor can it recover its own damages regarding three specific Bayer medicines for any time period. However, the

---

[1] *Parens patriae* literally means "parent of the country," and refers traditionally to the role of state as sovereign and guardian of persons under legal disability. Black's Law Dictionary, 5th ed., p. 1003.

State contends that *parens patriae* claims were not contemplated by the parties to be part of the Agreement, and Bayer is now trying to include a settlement term that was not originally included. The State asserts that *parens patriae* claims are for the benefit of its citizens, not the State. This is why, the State argues, its *parens patriae* claims may go forward even though they were not expressly reserved in Part III(6) of the Agreement. The State thus requests that its First Amended Complaint not be dismissed.

Upon review, this Court determines that the Agreement bars the State from bringing suit against Bayer in a *parens patriae* capacity. In reaching this conclusion, and as more fully discussed below, this Court determines that *parens patriae* claims brought by the State on behalf of its citizens fall within the scope of Covered Conduct, the State has a separate and distinct interest in *parens patriae* claims from its citizens, and the Agreement did not preserve *parens patriae* claims.

The Covered Conduct, as the name suggests, is the only conduct released by the Agreement. The State contends that the money paid under the Agreement was "only for Medicaid Program overpayments and penalties" and the "recovery did not in any way represent inflated co-payments made by Nevada private payors." Opposition, p. 8: 9-11, May 10, 2004. Thus, the State contends that its *parens patriae* claims are not Covered Conduct and can proceed since they do not relate to conduct in association with the Medicaid program. Bayer, on the other hand, asserts that the Covered Conduct relates to the alleged AWP inflation for the six Qui Tam Drugs, which is precisely what the parties settled when they entered into the Agreement.

This Court agrees with Bayer's interpretation of the meaning of Covered Conduct. The Covered Conduct is not limited in scope to the Medicaid program, as the State claims. Rather, the Covered Conduct relates to Bayer's marketing scheme whereby it allegedly inflated the AWP of the Qui Tam Drugs. See Agreement, Part II(C)(i) (alleging that Bayer knowingly and intentionally engaged in a marketing scheme whereby it inflated the AWP of the six Qui Tam Drugs). Although the Agreement was not an admission by Bayer of any liability or wrongful conduct, the basis of the allegations against Bayer was that it

knowingly and intentionally engaged in AWP inflation. Id. at II(C) and (G). Thus, any claims, even those initiated by the State in a *parens patriae* capacity, relating to alleged AWP inflation of the six Qui Tam Drugs fall within the meaning of Covered Conduct as contemplated by the Agreement.

The State's assertion that its *parens patriae* claim is brought as a representative of the public rather than in a proprietary capacity is misplaced. While Nevada citizens are free to pursue individual claims against Bayer, the Agreement bars the State itself from pursuing recovery. Case law is clear that the State has a distinct "interest apart from the interests of particular private parties." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 607 (1982). The State, as plaintiff, is more than just a nominal party in a *parens patriae* action and must express a quasi-sovereign interest. Id. Quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace." Id. at 602; see also Foucha v. Louisiana, 504 U.S. 71, 96 (1992) (stating that in "the civil context, the State acts in large part on the basis of its *parens patriae* power to protect and provide for an ill individual"). The State itself "has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable to...care for themselves." Heller v. Doe by Doe, 509 U.S. 312, 332 (1993). Thus, the State has a definite interest in its *parens patriae* claim separate from its citizens. Part III(2) of the Agreement expressly declares that the State releases Bayer "from *any* civil or administrative monetary claim, action, suit or proceeding *the STATE has or may have under any source of law* for the Covered Conduct." (emphasis added). *Parens patriae* claims, as civil claims the State has, were thus released when the parties entered into the Agreement.

As the State correctly notes, *parens patriae* claims were not expressly released in the Agreement. However, this does not mean that such claims were preserved. Part III(2) states that all of the State's claims against Bayer are released, "[s]ubject to the exceptions in Part III(6)." Thus, only those claims expressly included in Part III(6) are not released by the settlement. Part III(6) does not mention *parens patriae* claims, and accordingly, they were not preserved. Since *parens patriae* claims are Covered Conduct under the

Agreement, and because they are not preserved under Part III(6), the State is barred from bringing such claims. Of course, as Bayer concedes, Nevada citizens may pursue their own individual claims against Bayer. However, the State itself cannot bring such claims, even in a *parens patriae* capacity.

Part III(2) of the Agreement states that Bayer's payment of the settlement "fully discharges BAYER from any obligation to pay restitution, damages, and or any fine or penalty *to the STATE* for the covered Conduct." (emphasis added). Pursuant to Nevada law, any money recovered by the State in a *parens patriae* capacity must be distributed to those affected Nevada citizens. See NRS 598.0975(3)(b) (asserting that money collected for restitution ordered in a deceptive trade practices action "must be deposited by…the attorney general for distribution to the person for whom the restitution was ordered"). Thus, no money will be paid to the State when suit is brought in a *parens patriae* capacity. However, the fact that the State will not recover any money in its *parens patriae* claim is not dispositive. Although any money recovered in a *parens patriae* claim goes directly to the affected citizens, a *parens patriae* claim is still one that the State has, and such an action is clearly barred by Part III(2) of the Agreement. See Alfred L. Snapp & Son, Inc., 458 U.S. at 607 (stating that the State has a separate and distinct interest apart from is citizens in a *parens patriae* claim). Since the State has an independent interest in the action, the Agreement bars it from going forward with any claims against Bayer.

The State further argues that it has standing to seek restitution for its citizens under the Deceptive Trade Practices Act, which, the State contends, expressly authorizes the State to bring *parens patriae* claims. See NRS 598.0903 to 598.0999. The State incorrectly interprets these statutory provisions. The State cites NRS 598.0975(3)(b), claiming that it allows the Attorney General to bring an action in restitution. However, nothing in NRS 598.0975(3)(b) confers upon the Attorney General a statutory right to seek restitution. Rather, section 598.0971(2)(c) confers upon the commissioner of consumer affairs the authority to order a violator of the Deceptive Trade Practices Act to pay restitution for any money or property improperly received or obtained as a result of a violation. Such

restitution is ordered on behalf of individuals who were victims of a defendant's deceptive trade practices, not on behalf of the State. NRS 598.0975(3)(b) does not, as the State contends, grant a statutory right to restitution. All it does is provide that any restitution recovered by the Attorney General shall be distributed to those citizens for whom the restitution was ordered, rather than be deposited in the state general fund as required in subsection (1) of NRS598.0975. This inquiry regarding restitution is entirely different from the State's claim that the legislature has expressly conferred *parens patriae* authority upon its Attorney General. See In re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 521 (E.D. Mich. 2003). Thus, NRS 598.0975(3)(b) does not provide the State with the authority to seek restitution, and separately, the State's *parens patriae* authority has been barred by the Agreement.

A similar action has been brought in the United States District Court for the District of Massachusetts. In re Pharmaceutical Industry Average Wholesale Price Litigation, 01-12257-PBS, June 10, 2004. In that case, the States of Montana and Nevada alleged that pharmaceutical manufacturers fraudulently overstated the published AWP of many of their prescription drugs. Facing the same issue and an identical settlement agreement as this Court faces in the present matter, the Massachusetts court dismissed "all fraud claims concerning drugs covered by the 2001 and 2003 settlements between Montana and Bayer, even those brought in a *parens patriae* capacity." Id. Thus, this Court's ruling that the Agreement bars the State's *parens patriae* claims is consistent with the opinion issued by the Massachusetts court.

The State's Amended Complaint names several pharmaceutical companies, including Bayer, as defendants. However, of the named defendants, only Bayer has previously entered into a settlement. The subject matter of the State's Amended Complaint – alleged AWP inflation – is identical to the subject matter of the Agreement entered into between the parties. Bayer's settlement with the State was effected to "avoid the delay, uncertainty, inconvenience and expense of protracted litigation." Agreement, Part II(F). Allowing the State to pursue its *parens patriae* claim would go against the underlying purpose of the

Agreement. Under the Agreement, the State released Bayer from any claims it has or may have. A *parens patriae* claim certainly is one the State has, and the State gave up its right to pursue such a claim when it entered into the settlement with Bayer. Therefore, the State is barred from bringing a claim against Bayer in a *parens patriae* capacity. Accordingly, with respect to the State's *parens patriae* claims, Bayer's *Motion to Dismiss the Amended Complaint* is GRANTED.

IT IS SO ORDERED.

Dated this 13 day of December, 2004.

DISTRICT JUDGE

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the 14 day of December, 2004, she mailed copies of the foregoing ORDER DENYING MOTION TO DISMISS in Case No. CV02-00260 to the following:

Steve W. Berman, Esq.
Sean R. Matt, Esq.
Hagens Berman, LLP
1301 Fifth Ave., Suite 2900
Seattle, WA 98101

Brian Sandoval, Esq.
Nevada Attorney General
L. Timothy Terry, Esq.
198 N. Carson Street
Carson City, NV 89701

R. Christopher Cook
Jones, Day, Reavis & Pogue
51 Louisiana Avenue, NW
Washington, DC 20001-2113

Burton Bartlett & Glogovac
50 W. Liberty St., Ste. 650
Reno, NV 89501

Daniel E. Reidy, Esq.
Jones, Day, Reaves & Pogue
77 West Wacher, Ste. 3500
Chicago, IL 60601-1692

Matthew A. Rossi, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036

Clark V. Vellis, Esq.
Jones Vargas
100 West Liberty Street, 12th Floor
Reno, NV 89504-2081

Merle M. DeLancey, Esq.
Tina D. Reynolds, Esq.
Dickstein, Shapiro, Morin & Oshinsky

2101 L Street NW
Washington, DC 20037-1526

Lisa C. Phelan, Esq.
Akin, Gump, Strauss, Hauer & Feld LLP
2029 Century Park East, Ste. 2400
Los Angeles, CA 90067

Thomas B. Hamilton, Esq.
Akin, Gump, Strauss, Hauer & Feld LLP
1700 Pacific Avenue, Ste. 4100
Dallas, TX 75201

Lyndon M. Tretter, Esq.
Hogan & Hartson
875 Third Avenue
New York, NY 10017

Pat Lundvall, Esq.
McDonald, Carano, Wilson, McCune-Bergen, Frankovich & Hicks
241 Ridge Street, 4th Floor
Reno, NV 89505-1670

Stephen Hudspeth, Esq.
Coudert Brothers, LLP
1114 Avenue of the Americas
New York, NY 10036

J. Thomas Susich, Esq.
Crowell, Susich, Owen & Tackes, Ltd.
510 W. Fourth Street
Carson City, NV 89703

Allen J. Wilt, Esq.
Lionel, Sawyer & Collins
50 West Liberty Street
Suite 1100
Reno, NV 89501

Ethan M. Posner, Esq.
Covington & Burling
1201 Pennsylvania Ave. NW
Washington, DC 20004-2401

Matthew L. Larrabee, Esq.

Heller, Ehrman, White & McAuliffe, LLP
333 Bush Street
San Francisco, CA 94104

Robert B. Hubbell, Esq.
Heller, Ehrman, White, McAuliffe
601 South Figueroa St.
40th Floor
Los Angeles, CA 90017

Thomas F. Kummer, Esq.
Gavin C. Jangard, Esq.
Kummer, Kaempfer, Bonner & Renshaw
3800 Howard Hughes Parkway
Seventh Floor
Las Vegas, NV 89109

Scott A. Stempel, Esq.
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004

Kathryn Rogers
Administrative Assistant

**CERTIFIED COPY**
The document to which this certificate is attached is a full, true and correct copy of the original on file and of record in my office.
DATE: JAN 31 2005
RONALD A. LONGTIN, Jr., Clerk of the Second Judicial District Court, in and for the County of Washoe, State of Nevada.
By [signature] Deputy